# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### May 13, 2014 Session

## STATE OF TENNESSEE v. JERRY BRANDON PHIFER

**Appeal from the Criminal Court for Davidson County**
**No. 2011B1782     Cheryl A. Blackburn, Judge**

---

### No. M2013-01401-CCA-R3-CD - Filed September 23, 2014

---

The defendant, Jerry Brandon Phifer, was convicted of one count of aggravated robbery, a Class B felony, and one count of aggravated burglary, a Class C felony. On appeal, the defendant argues that the trial court erred by: (1) denying his motion to suppress the results of a traffic stop that occurred two weeks prior to his arrest; (2) denying the motion to suppress evidence seized as a result of the warrantless installation of a GPS tracking device; (3) finding that the State had probable cause to arrest the defendant; (4) finding that the defendant's waiver of his *Miranda* rights was knowing and voluntary; (5) declaring Jongho Lim an unavailable witness pursuant to Tennessee Rule of Evidence 804 and admitting his prior testimony as substantive evidence; (6) imposing consecutive sentences; and (7) violating the defendant's due process rights based upon the cumulative effect of the errors. After review of the record and the applicable law, we affirm the trial court's findings in issues 1, 4, 5, and 6. We conclude that the warrantless use of the GPS tracking device constituted an illegal search, and the evidence obtained therefrom, including the defendant's arrest and statements to police, must be suppressed. We reverse the trial court's denial of the motion to suppress the evidence and remand the case for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed in Part, Reversed in Part, and Case Remanded**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which JAMES CURWOOD WITT, JR., and ROGER A. PAGE, JJ., joined.

Jim Todd, Nashville, Tennessee, for the appellant, Jerry Brandon Phifer.

Robert E. Cooper, Jr., Attorney General and Reporter; Clark B. Thorton, Senior Counsel; Victor S. (Torry) Johnson, III, District Attorney General; and Bret Gunn, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**Facts and Procedural History**

A Davidson County grand jury indicted the defendant for aggravated robbery, five counts of aggravated burglary, five counts of theft of property, and possession of a deadly weapon other than a firearm during the commission of a dangerous felony. The trial court granted the defendant's motion to sever, and an amended indictment was issued charging the defendant with one count of aggravated robbery and one count of aggravated burglary.

The defendant filed a motion to suppress his statements to police, arguing that he was unlawfully arrested, that his waiver of his *Miranda* rights was a product of police coercion, that his waiver was not knowing and voluntary, and that his waiver was not sufficiently attenuated from the taint of the unlawful arrest. At the motion to suppress hearing, Detective Robert Shotwell of the Metropolitan Police Department testified that his precinct saw a large rise in burglaries during the first three months of 2011. Several weeks prior to the defendant's arrest, Betty Bower called to report that a white male came to her door and knocked on it. When Ms. Bower opened the door, she saw that the man had socks on his hands, and he asked for someone who did not live there. Ms. Bower informed him that the person did not live there, and the man departed. Officers did not respond immediately to Ms. Bower's call but were able to follow up and speak with Ms. Bower before the defendant's arrest. Detective Shotwell testified that he was unsure of the exact date that his office received information about Ms. Bower's report but was sure that it was before the date of the defendant's arrest.

Ms. Bower told her neighbor, Daniel Osborne, about the incident. Mr. Osborne was able to tell police about a "beige or gold" 2000 Cadillac with the license plate number 889 PZW, and police assumed that the car belonged to the man Ms. Bower described. Officer Joe Cadden later spotted the vehicle and observed the defendant lying on the bench-style front seat with his "feet out the window in the passenger's side." Officer Cadden could not see any part of the defendant's upper body, and he decided to stop the vehicle based upon his suspicion that the defendant was in violation of the seat belt law. Officer Cadden believed that it would have been impossible for a person to sit in the same manner as the defendant while properly wearing a seat belt. Officer Cadden could not recall whether the defendant

2

fastened his seatbelt once the vehicle was stopped. Officer Cadden implied that the defendant was wearing the seatbelt improperly because the belt was not visible across the defendant's chest. Officer Cadden did not issue a ticket for a seat belt violation, and he wrote in his report that he stopped the vehicle because the defendant had "both legs from the knee down hanging outside of the vehicle['s] right front window." The report made no mention of a seatbelt violation.

The driver of the vehicle was Tina Stewart, the defendant's girlfriend. Ms. Stewart consented to a search of the vehicle, and the defendant told officers that his home address was 212 Cedarview Drive in Antioch, Tennessee.[1] Officer Cadden found two flashlights, two screwdrivers, Xbox games, one GPS, four jewelry boxes with fifty pieces of jewelry, two cell phones in addition to the phones belonging to Ms. Stewart and the defendant, a blue latex glove, blue cloth gloves, and empty trash bags. Officer Cadden could not find a reason to charge the defendant with a criminal offense, so he made a report that was forwarded to detectives. Detective Shotwell discovered this report on the day before the defendant's arrest.

Detective Shotwell stated that there was a burglary at the address of 1842 Shaylin Loop, where Katie Piper, a neighbor of the victim, observed two suspects: a white male, described as "[e]ighteen to 23, 5'8", 120, blonde or strawberry hair, eyes unknown, wearing a black hat, black T-shirt and blue jeans," and a white female, "18 to 22, 5'6", red or auburn hair, unknown eyes, white tank top[.]" Ms. Piper saw both suspects in a gold Cadillac with a license plate that started with the letters "VFN." Ms. Piper witnessed both suspects participate in the burglary, and she observed the partial license plate from across the street. She took a photograph of the vehicle with her cell phone and sent it to Detective Shotwell. Detective Shotwell testified that the Cadillac in the photograph had tinted windows and specialty rims. Ms. Piper later identified Ms. Stewart from a photograph lineup as the driver of the vehicle.

On April 14, 2011, a burglary occurred at 675 Harding Place. Jongho Lim was asleep in his aunt's apartment when a suspect entered the apartment with a knife and demanded jewelry and "whatnot." Mr. Lim described his assailant as a white male aged "27 to 35, 5'9", 180, unknown hair and eyes, clean shaven, red and gray ballcap and t shirt, blue jeans." During this incident, a neighbor, Andrew George, saw a bronze, four-door Cadillac Deville with darkly-tinted windows and expensive-looking rims. Detective Shotwell testified that a photograph lineup was prepared and shown to the victim and that the defendant was not chosen from the lineup.

---

[1]This address was later discovered to be the address of the defendant's mother.

On that same day, there was a burglary at 4936 Salem Drive, where Tiffany Fykes observed the suspect and his vehicle. She described the suspect as a white male, "unknown in ethnicity, 30 or 35, 6'0", 200 pounds, unknown hair, unknown eyes, and unknown scars, wearing a white ball cap, a red shirt," in a tan, four-door Cadillac Deville.

By this date, the defendant had come to Detective Shotwell's attention as a primary suspect in the burglaries. Detective Shotwell was aware that the defendant had a prior criminal record consisting of four aggravated burglaries and several other felonies and that the defendant was on probation.

The defendant was arrested on April 15, 2011. The night before the defendant's arrest, police officers placed a Global Positioning Satellite ("GPS") tracking device on the defendant's Cadillac while it was parked at an apartment complex. Officers did not have a warrant to use the GPS tracking device. Detective Shotwell testified that officers were confident that the defendant was the individual who was responsible for the recent burglaries when they placed the GPS device on the defendant's car.

Detective Shotwell testified that locating the vehicle at 808 Ilawood Court was "absolutely" facilitated by information from the GPS tracking device. He agreed that the GPS device alerted officers to the defendant's location, and an officer was able to drive by the residence and observe the vehicle parked in the grass of the front yard of 808 Ilawood Court.

On cross-examination, he testified that officers drove their vehicles through the neighborhood and crossed paths with the defendant when the defendant began to move throughout the neighborhood. He stated that Detective Keller spotted the defendant "at the corner of Ilawood and Ilawood Court" and that Detective Keller "also was able to swing around and see the car in front." He admitted that officers could have been watching the GPS device at the time but was unsure whether anyone was. He agreed that the GPS device "assisted" officers in locating the vehicle at the Ilawood address, and then officers were dispatched to the residence.

A few moments later, officers noticed that the vehicle was no longer at the Ilawood residence. Detective Shotwell estimated that "two or three minutes" could have elapsed before officers realized the vehicle was gone. Detective Shotwell then approached the residence and noticed that "[t]he front door was busted in and the house had been ransacked." He testified that around eight officers were "in and around the neighborhood" and that none of them could see the defendant's residence from their surveillance points. The car was discovered at the defendant's residence a short time later. Detective Shotwell stated that he knew that Detective Keller went to the defendant's residence and that officers knew that the

4

defendant's vehicle was at his residence. He was unsure whether the GPS device was being used at the same time that Detective Keller observed the vehicle in the defendant's driveway or if the discovery was made solely due to Detective Keller's visual observation.

Detective Shotwell testified that the defendant's address was "as a crow flies maybe a quarter mile" from the Ilawood address. Detective Shotwell was in a vehicle with Sergeant Meadow and Detective Traughber, and they proceeded to the defendant's residence knowing only that the vehicle from the Ilawood robbery was in the defendant's driveway. They spotted the defendant walking on the street and initially passed the defendant because the officers "were kind of dumbfounded, like he is walking down the street." The officers then turned around and stopped the defendant.

The defendant told the officers that he had been out smoking and walking around the neighborhood. When officers asked him for identification, the defendant produced a Tennessee driver's license that belonged to another individual. The defendant was then arrested after he was told that there was a warrant for his arrest due to a failure to appear. Detective Shotwell admitted that the defendant did not have an outstanding warrant. The defendant did not make any admissions about the burglaries at that point, and Detective Shotwell estimated that the defendant was arrested "two or three minutes" after officers began talking to him.

Detective Shotwell then proceeded to the defendant's address. He confirmed that the address was the same one that the defendant provided to Officer Cadden during the traffic stop for the seatbelt violation. The Cadillac was parked in the driveway, and Detective Shotwell noticed that the wheels and wheel wells of the vehicle had grass "from Ilawood from the front yard where it spun." As he approached the vehicle, Detective Shotwell observed jewelry lying in the grass between the residence and the vehicle. He photographed the jewelry and sent the photograph to an officer who was at the Ilawood residence. The officer showed the victim the photograph, and the victim identified the jewelry as property taken during the burglary.

Detective Shotwell testified that because he was aware that the vehicle had just left the scene of the burglary, he considered the defendant "an 'A' No. 1 prime suspect[.]" Officers linked the defendant to the Cadillac based upon the prior traffic stop, the fact that Ms. Stewart was identified as the driver at the Shaylin Loop burglary, and because officers knew that Ms. Stewart was the defendant's girlfriend. Detective Shotwell stated that police "had a pretty good indication that [the gold Cadillac] was [the defendant's] car."

The defendant testified that detectives informed him that he had a warrant for his arrest based upon a failure to appear. He gave officers a fake identification because he

5

believed that he had an outstanding warrant from North Carolina. A patrol car was called to the scene, and the defendant was placed in the back of the car. He then asked officers to take him to jail, and the officers replied that they were taking him to the South Precinct. The defendant estimated that fifteen minutes elapsed from the time when he was placed in custody to the time when he arrived at the South Precinct. He was placed in a holding cell for "30 to 45 minutes" and then was taken to "an isolated room with a table and numerous chairs." Prior to arriving in the room, the defendant was not questioned by anyone and did not make any statements. The defendant repeatedly told detectives that he did not have an outstanding warrant for failure to appear.

The relevant portions of the interview exchange are as follows:

Detective 1: I can tell by talking with you that you're nervous about something.

Defendant: I am not nervous. I am pissed off. I thought I had a child support warrant. I'm not going to lie to you. My baby mama went to Court like two weeks ago and-she went to court and they're coming to get me.

. . . .

Defendant: When the cop came up, I thought this is it, but they say it was a misdemeanor failure to appear. But I didn't get served no papers for me to go to court for child support,

Detective 1: So, it was a misdemeanor? Failure to appear?

Defendant: That's what the cops said. But, I didn't even have papers for me to go to court. But, just my baby's mama saying they're coming to get you, I am assuming they are coming to get me, but that wouldn't be a failure to appear. They say it's failure to appear, but I ain't been in no trouble to have a failure to appear to even go to anything.

[. . . . [D]iscussion about Defendant's medication Roxycontin and Xanax. Detective 1 notes that the defendant's hands are a little shaky.]

. . . .

Defendant: They said a burglary or robbery or something happened like

6

right down the street or wherever the hell it was. I'm walking around my neighborhood three different times.

. . . .

Detective 1: I'm going to read this upside down to you. This is the official, official, official, official, formal rights waiver, okay?

Defendant: hmm mm.

Detective 1: Is there a reason- -

Defendant: Are you pretty much threatening me if I don't talk to you, you are going to arrest me for something is that it?

Detective 1: Uh, I am not sure what charges you have on you. I came in on tail end of this.

Defendant: You're telling me—

Detective 1: You are under arrest. You were in handcuffs. You are under arrest, okay.

Defendant: For a failure to appear? I don't have no failure to appear[.]

Detective 1: [looks to Detective 2]. I'm going to tell him this I don't know.

Defendant: I have no failure to appear. I wouldn't have a failure to appear to have a failure to appear. I wouldn't have a court date to have that.

Detective 1: Let me ask you this. This first question—

Defendant: I just want—

Detective 1: [reading from form] Is there a reason to believe that the interviewee is intoxicated by alcohol or drugs.

Defendant: I'm on Roxy—

7

Detective 1: Are you intoxicated?

Defendant: No.  I'm on medication if you call that intoxicated.

Detective 1: I mean I don't but I am asking you.

Defendant: I don't feel intoxicated.

Detective 1: You understand what we are talking about—that you are not off in la la land going "I don't know where I am at."

Defendant: I'm not f***** up.

Detective 1: Okay.

Defendant: What I am asking you, you asking me questions.  What are you talking about if I don't talk to you you're going to arrest me?

Detective 1: You are under arrest.

Defendant: For what?

Detective 1: [to Detective 2] Somebody tell me what is going on.  I need to know.

Defendant: I have no failure to appear for anything.

Detective 2: [pointing to rights waiver form] I have to add.  If you want to talk to me, we'll talk to you but we have to have these questions answered, okay?  I mean you're—

Detective 1: We have to make sure—

Detective 2: You are under arrest—

Defendant: For what?

Detective 2: If you want to talk to us I will talk to you about it, okay?

Defendant: But, if I am under arrest what is the point of even talking

about it?

Detective 2: That's your decision. I can't make it for you.

. . . .

Defendant: If I am under arrest, I am under arrest. Let's go[.] [stands up]

Detective 2: Okay. [gathers papers and moves to get up]

Detective 1: [to defendant] Where are you going to go?

Defendant: What am I under arrest for? What did I do? I haven't done anything. The same thing that is happening six months ago is happening now.

Detective 1: Do you want to try and clear this up or not?

Defendant: Are you going to let me go?

Detective 1: Yes or no?

Defendant: Are you going to let me go?

Detective 1: It's a good possibility.

Defendant: A possibility or yes or no?

Detective 1: I guarantee it won't hurt you.

Defendant: I mean the guy [gesturing to Detective 2] is saying I am under arrest, but he won't tell me what I am under arrest for. I mean—

Detective 2: I have to have my question—if you want to speak to me, then I have to have this [points to rights waiver] filled out.

Detective 1: Let's get this out of the way—

Detective 2: If you don't want to speak to me—

Defendant: I just want everybody on the same page.

Detective 2: We are all on the same page. I can't talk to you unless you want.

Defendant: You can't evidently tell me why I am under arrest?

Detective 1: [referring to rights waiver] This is the right page. Everyone is on this page right now. You want to clear this up—

Defendant: He's not going to talk to me?

Detective 1: He's obviously not as friendly as I am. He's not going to talk to you.

Detective 2: Look [shrugs; inaudible]

Defendant: Why can't you tell me why I am under arrest for, brother?

Detective 1: I think he will in a minute.

Detective 2: I will. And, I will tell you everything about it. But I have to have [pointing to rights waiver] - if you want to know you have to fill out your rights.

Defendant: You told me if I talked to you and got everything cleared up I'm gone. Is that not—

Detective 1: If you convince us - I said if you convince us you were not involved in anything then, yeah, you're gone.

Defendant: [looking to Detective 2] I mean is that not the case?

Detective 2: [shakes head] Talk to this man right here.

Defendant: I am asking you. Is that what it is?

Detective 1: Listen, if that what it is—If you didn't do anything then you have nothing to worry about, okay?

10

Defendant: [mumbles]

Detective 1: Yes or no? Let's get this right waiver out of the way okay?

Defendant: Yeah.

Detective 1: What was the last grade you completed in school?

Defendant: I got my GED.

Detective 1: And you said something about college too [referring to conversation before Detective 2 entered room]

Defendant: I got two degrees, an Associate's Degree in Business Management and Business Communication.

Detective 1: Okay. This is your rights [turns form to Defendant]. I am going to read it upside down. [Goes on to read waiver form]. No promises or threats have been made to me and no pressure or coercion—

Defendant: Threats have been made to me.

Detective 1: has been used against me.

Defendant: If I don't talk I am going to be arrested.

Detective 1: No threats have been made. A threat would be somebody is going to whoop your ass if you don't talk. That would be a threat. Or we got your family hostage and if you don't talk somebody is going to get hurt.

Defendant: You have nothing to arrest me for. I have done nothing.

Detective 1: Let me ask you this. Did you understand?

Defendant: I understand everything that you said.

Detective 1: If you understood it all I need is your signature right there.

Defendant: [signing form] I understand everything. I have no reason to have an arrest for anything. Maybe child support. If you don't got anything

for child support then you don't have reason for me to be under arrest for anything.

Detective 1: Like I said I came on the tail end. This guy right here—

Defendant: My background, my background just makes me f*****' seem—. My [inaudible] background makes me look like a, like a serial killer.

Detective 1: We are not talking about your background right now, okay. Like I told you a little bit ago. We ain't worried about background. We are worried about -

Defendant: You lied to me.

Detective 1: Whoa, whoa—when did I lie to you?

Defendant: You said go answer these questions, get this cleared up, and you're on your way. Now I got that I am under arrest.

Detective 1: I said if you convince us that you were not involved then you would be on your way. Did I not? Don't call me a liar.

The defendant testified that he had consumed crack cocaine, Roxycontin, and Xanax that day and that he told Detective William Stewart about the drugs he had been taking. He recalled signing a rights waiver but testified that he "didn't understand what the situation behind it was" and that officers told him what the waiver was after he signed it. The defendant signed the waiver because he felt as though he was not going to be able to leave unless he cooperated with detectives. He testified that Sergeant Jason Beddoe told him that they had arrested one of the defendant's friends a year ago and that the friend received a twenty-year sentence because he was uncooperative. The defendant said that at one point he rose to leave, and the detectives "got all hysterical[,]" with one detective banging "both fists on the table." He testified that this response scared him "pretty much to where [he] sat back down." He said that he "honestly didn't know" what would happen to him if he told the officers he did not wish to speak with them. He confirmed that he knew that individuals arrested in Davidson County were brought before a commissioner to learn the charges against them and what the bond amount would be.

The defendant testified that officers informed him that they had a large caseload of burglaries that they wanted to take care of and that if he cooperated they would tell the district attorney about his cooperation, and he would not be charged with the crimes. He then

12

said he got into a vehicle with the officers, who took him to numerous apartment complexes. He testified that during the ride, officers "might have said, 'There has been 20 burglaries here in the last eight months[.]'" He admitted to committing the burglaries but told officers, "You can't convict me for it, I ain't done it[.]"

Sergeant Jason Beddoe, a supervisory sergeant of the Burglary Division in the South Precinct, testified that his first conversation with the defendant occurred after officers spotted the defendant walking down the road. Sergeant Beddoe informed the defendant that he was under arrest for "either for failure to appear or child support, a warrant, something like that." Sergeant Beddoe confirmed that the warrant was "fictitious," but he testified that the defendant was under arrest at the time because officers suspected that he had been involved with a burglary and because he provided false identification.

Sergeant Beddoe next spoke with the defendant when the defendant took a break during his interview to smoke a cigarette. This conversation occurred off-camera and after the defendant had waived his *Miranda* rights. Sergeant Beddoe and the defendant went outside, and the defendant told Sergeant Beddoe that he felt like his life was over. Sergeant Beddoe empathized with the defendant and told him that his arrest could be a positive thing because it would afford him the opportunity to change his life for the better. Sergeant Beddoe said that he and the defendant discussed "honesty being the best policy" and Sergeant Beddoe's understanding that addiction to drugs provided the motive for the defendant to commit burglaries. Sergeant Beddoe stated that he understood that the majority of residential burglaries were motivated by addiction. Sergeant Beddoe testified that he did not make any promises to the defendant but told him that he wanted to be able to tell the district attorney what type of person the defendant was if the district attorney asked him. Sergeant Beddoe spoke with the defendant for "[a]s long as it takes to smoke a couple of cigarettes."

Upon returning to the interview room, Sergeant Beddoe asked the defendant on the record whether he had been promised, threatened, or coerced during their discussion. The defendant replied that he had not. Sergeant Beddoe testified that he never told the defendant that he would tell the district attorney that the defendant had been honest but that the "statement was made in regard to just the general philosophy in human beings that when you're remorseful and you're honest oftentimes people are less likely to be more aggravated in how to handle circumstances." Sergeant Beddoe did not recall why he gave the defendant his business card but believed that it was to allow the defendant to contact him if he was released from jail and had helpful information to provide to police.

At trial, Hoe Chong testified through an interpreter that on April 14, 2011, she lived in apartment number N6 at 675 Harding Place. Her nephew, Jongo Lim, was staying with her and her husband on April 14, 2011, and someone broke into their apartment that morning.

13

She was not at home at the time of the break-in but found out about the break-in when she returned home and saw the broken door. Ms. Chong's television and cell phone were stolen, along with Mr. Lim's laptop computer and iPhone.

Sonny Dothard, the information technology director for the Criminal Clerk's office, testified that his office produced a recording of the testimony of Mr. Lim from the preliminary hearing. Mr. Lim's testimony was then played in open court.

Mr. Lim testified that on the morning of April 14, 2011, he was asleep when he was awakened at 6:30 a.m. by a white male whom he did not know. Mr. Lim was not wearing his glasses, so he could not recognize the man very well. The man held a knife to Mr. Lim and told him to get up. The man asked where the money and jewelry were. Mr. Lim told the man that he did not speak English and that he did not know where the money and jewelry were because it was not his home. The man then took Mr. Lim through the bedroom and downstairs to search for money and jewelry. The man continually threatened Mr. Lim that he would kill Mr. Lim and his family and told him to find the money and jewelry. The man ordered Mr. Lim to unplug the television, and the man took the television and threatened Mr. Lim again. The man told Mr. Lim to return upstairs with him, and he took Mr. Lim's iPhone and laptop. He instructed Mr. Lim to lie on the floor and count to twenty, and the man then left the residence. Mr. Lim waited for his family to return, and they returned about ten to fifteen minutes after the man left. The police were called, and Mr. Lim saw a lineup at about 8:00 a.m. that morning. He testified that the man was wearing a hat, a red T-shirt, jeans, and blue gloves. He testified that the man was about 180 centimeters tall.

Andrew George, a neighbor of Ms. Chong, testified that he heard a commotion coming from Ms. Chong's apartment on the morning of the incident. He heard what sounded like "stuff being tossed around." He later looked outside and saw a bronze, four-door Cadillac with darkly tinted windows and "custom or fancy" wheels. Mr. George believed that the Cadillac was a Coupe de Ville. He saw the vehicle as it was leaving, and he testified that he did not see anyone exit Ms. Chong's apartment and enter the vehicle and that he could not see anything about the individuals inside the vehicle.

Officer Mike Pyle of the Metro Police Department testified that he responded to a robbery and burglary scene at 675 Harding Place, Apartment N6. He spoke with Mr. Lim, Ms. Chong, and Mr. George. He observed that the door and door frame were damaged and requested that the identification section unit come to the scene to collect fingerprints. He testified that Mr. Lim was able to speak broken English, so he communicated with Mr. Lim with the assistance of a family member. Mr. Lim was able to recall the incident himself "[t]o some degree."

14

Detective Shotwell testified that he interviewed the defendant on the day of his arrest. Portions of the interview were then played for the jury. During the interview, the defendant admitted that he participated in the robbery at 675 Harding Place and identified the victim as "some Chinese dude." The defendant also stated that he was carrying a knife, and he said that he had access to a Cadillac de Ville. Detective Shotwell stated that he saw a Cadillac de Ville at the defendant's mother's residence on the day the defendant was arrested and interviewed and agreed that the defendant was carrying a knife on the day that police encountered him.

Detective Shotwell testified that the defendant's mother lived about "[f]ive to seven miles or so roughly" from the apartment at 675 Harding Place and that it would take "ten or twelve minutes or so" to arrive in a vehicle. He stated that Mr. Lim was unable to pick the defendant out of a photographic lineup and that the fingerprints collected at the scene were "of no value." Detective Shotwell agreed that a red T-shirt and blue gloves were not found during a search of the defendant's mother's residence, nor was any of Mr. Lim's property recovered.

At the conclusion of Detective Shotwell's testimony, the State rested, and the defendant did not put on any proof. The jury subsequently found the defendant guilty of aggravated robbery and aggravated burglary.

At the sentencing hearing, both trial counsel agreed that the defendant was a persistent offender. Detective Shotwell testified at the hearing and agreed that the defendant rode with him and pointed out homes that he had burglarized. This ride was not recorded, but Detective Shotwell made notations regarding the homes the defendant admitted to burglarizing. Detective Shotwell prepared two lists: one indicating burglaries the defendant confessed to committing where property connected with the burglary was discovered in the defendant's home and a second list indicating burglaries the defendant admitted to where no property was recovered. The defendant confessed to a total of forty-three burglaries: twenty-six where property was not recovered and seventeen where property was recovered. The court then sentenced the defendant to a thirty-year sentence for Count 1 and a fifteen-year sentence for Count 2.

The court ordered the sentences to be served consecutively, finding that the defendant had an extensive criminal history and that he was sentenced for an offense committed while on probation. The court found that the severity of committing an aggravated burglary where the victim was at home at the time and threatened with a knife in conjunction with the other forty-three burglaries necessitated consecutive sentencing. The court stated that confinement was necessary to protect the public from further serious criminal activity by the defendant because he committed the offenses while on probation for reckless aggravated assault. The

15

court found that the defendant received numerous opportunities to correct his behavior but failed to do so, instead continuing to commit criminal offenses.

The defendant filed a motion for new trial, which the trial court denied. He then filed this timely appeal, and we proceed to consider his claims.

**ANALYSIS**

**I. Traffic Stop**

The defendant argues that the trial court erred when it failed to suppress the results of the defendant's traffic stop. Specifically, he contends that reasonable suspicion did not exist to support the traffic stop because hanging one's legs from the knees down outside of a car window is not a prohibited offense.

The findings of fact made by the trial court at the hearing on a motion to suppress are binding upon this court unless the evidence contained in the record preponderates against them. *State v. Ross*, 49 S.W.3d 833, 839 (Tenn. 2001). The prevailing party is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence. *State v. Hicks*, 55 S.W.3d 515, 521 (Tenn. 2001). However, the application of the law to the facts found by the trial court are questions of law that this court reviews *de novo*. *State v. Daniel*, 12 S.W.3d 420, 423 (Tenn. 2000). Absent a showing by the defendant that the evidence preponderates against the judgment of the trial court, this court must defer to the ruling of the trial court. *State v. Cribbs*, 967 S.W.2d 773, 795 (Tenn.1998).

Both the Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution protect individuals against unreasonable searches and seizures. The purpose and intent of article I, section 7 is identical with that of the Fourth Amendment, which is to "'safeguard the privacy and security of individuals against the arbitrary invasions of government officials.'" *State v. Randolph*, 74 S.W.3d 330, 334 (Tenn. 2002) (quoting *Camara v. Municipal Court*, 387 U.S. 523, 528 (1967)).

Under both constitutions, a warrantless search or seizure is presumed unreasonable unless it is conducted under one of the narrowly defined exceptions to the warrant requirement. *State v. Binette*, 33 S.W.3d 215, 218 (Tenn. 2000). One such exception is a stop based upon either probable cause or reasonable suspicion that a traffic violation has occurred. *Whren v. United States*, 517 U.S. 806, 810 (1996). The existence of probable cause is a determination of "'whether at that moment the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were

16

sufficient to warrant a prudent man in believing that [the defendant] had committed or was committing an offense.'" *State v. Day*, 263 S.W.3d 891, 902 (Tenn. 2008) (quoting *Goines v. State*, 572 S.W.2d 644, 647 (Tenn. 1978)).

Another such exception is the initiation of an investigatory stop "based upon reasonable suspicion, supported by specific and articulable facts that a criminal offense has been or is about to be committed." *Binette*, 33 S.W.3d at 218 (citing *Terry v. Ohio*, 329 U.S. 1, 20-21 (1968)). In order to determine whether reasonable suspicion existed to justify the stop, the court must consider the totality of the circumstances. *Day*, 263 S.W.3d at 903. This inquiry includes, but is not limited to, such factors as objective observations, information obtained from other officers or agencies, information obtained from citizens, and certain offenders' patterns of operation. *State v. Watkins*, 827 S.W.2d 293, 294 (Tenn. 1992). The court should also take into account the rational inferences and deductions that a trained police officer may draw from the facts and circumstances known to him or her. *Id.*

Tennessee Code Annotated sections 55-9-603(a)(1) states that "[n]o person shall operate a motor vehicle on any highway, as defined in § 55-8-101, in this state unless the person and all passengers four (4) years of age or older are restrained by a safety belt at all times the vehicle is in forward motion." A violation of this provision is a Class C misdemeanor. T.C.A. § 55-9-603(d)(1) (2012). An officer's observation of a violation of this statute creates probable cause to justify the traffic stop. *State v. Harris*, 280 S.W.3d 832, 840 (Tenn. Crim. App. 2008); *see State v. Vineyard*, 958 S.W.2d 730, 735-36 (Tenn. 1997) (holding that subjective motivation of an officer is irrelevant when the observation of a traffic offense gave the officer probable cause to stop the vehicle).

Officer Cadden stopped the defendant's vehicle when he observed the defendant hanging both of his legs out of the window. Officer Cadden believed the defendant was in violation of the seatbelt law because he could not see the defendant's upper body and believed the seatbelt could not be properly fastened when the defendant was reclining in such a manner. The defendant argues that Officer Cadden's testimony is not credible because Officer Cadden could not recall if the defendant's seatbelt was buckled when he approached the vehicle and because he wrote in his report that he stopped the vehicle because the defendant's legs were hanging out of the window. He contends that his case is analogous to *State v. Jonathan Frederick Walker*, No. W2008-00757-CCA-R3-CD, 2009 WL 2998915, (Tenn. Crim. App. Sept. 21, 2009), in which this court affirmed the trial court's finding that an officer lacked reasonable suspicion or probable cause to initiate a traffic stop based upon a suspected seatbelt violation. However, this case is distinguishable from *Jonathan Frederick Walker*.

In *Jonathan Frederick Walker*, the officer's headlights illuminated the interior of the

17

defendant's vehicle, he observed the defendant "slumped over to the center of the front seat," and he did not observe the defendant wearing a seatbelt. *Id.* at *1. The trial court found that the officer's testimony was not credible with regard to his ability to determine that the defendant had not fastened his seatbelt. *Id.* at *2. This court affirmed the decision, concluding that there was "no basis for disturbing the trial court's credibility determinations." *Id.* at *3. Here, the trial court credited the testimony of Officer Cadden, unlike the trial court in *Jonathan Frederick Walker*. The court found that Officer Cadden had reasonable suspicion to make the stop to investigate a possible violation of the seatbelt law. We conclude that the evidence does not preponderate against the trial court's findings. The trial court is in the best position to assess the credibility of witnesses, weigh and evaluate the evidence, and resolve conflicts in the evidence. *See State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). Therefore, we affirm the denial of the motion to suppress and conclude that the defendant is not entitled to any relief as to this issue.

## II. GPS Device

The defendant argues that the trial court erred when it denied the motion to suppress evidence obtained from the warrantless installation of the GPS tracking device on the defendant's vehicle in light of the Supreme Court's recent decision in *United States v. Jones*, — U.S. —, 132 S. Ct. 945 (2012). Specifically, he contends that no good-faith exception to the exclusionary rule exists because there was no binding precedent that existed prior to the *Jones* decision to justify the warrantless use of the GPS device. He also contends that the good-faith exception is not applicable because the State did not raise it in response to the motion to suppress.

The State responds that Supreme Court precedent prior to *Jones* would lead a reasonable officer to believe that placing a GPS device on the defendant's vehicle was not a search and that it is not precluded from raising the good faith exception because the trial court's ruling was "squarely based" on *Davis v. United States*, — U.S. —, 131 S. Ct. 2419 (2011). The State did note that, although not mentioned by the defendant, "Tennessee courts have declined to recognize a 'good faith' exception to the exclusionary rule in other contexts" and argued that "[t]his case may be appropriate for a limited application of" the good faith exception to the exclusionary rule. The State cites *State v. Clifford Deleon Thomas*, No. E2012-01956-CCA-R3-CD, 2013 WL 4715660 (Tenn. Crim. App. Aug. 30, 2013), where this court dismissed an appeal of a certified question of law regarding the constitutionality of a city ordinance because the issue was not dispositive of the constitutionality of the traffic stop in question. *Id.* at *1, 3 ("[T]here is no language appearing anywhere in the certified question that asks this court to consider the issue of whether the traffic stop was in fact unconstitutional-and suppression of the evidence warranted-in the event that this court should agree with the defendant that the ordinance at

issue was invalid.").

In denying the defendant's motion to suppress, the trial court found that the *Jones* decision did not apply retroactively. The trial court relied on the reasoning of a Montana federal district court, which concluded that *Jones* was not retroactive due to the good faith exception to the warrant requirement. *United States v. Heath*, No. CR 12-4-H-DWM, 2012 WL 1574123, at *1 (D.Mont. May 3, 2012) (quoting *Davis*, — U.S. —, 131 S. Ct. at 2422 ("Searches conducted in objectively reasonable reliance on binding appellate precedent are not subject to the exclusionary rule.")). The trial court also found that the case was distinguishable from *Jones* because officers in the present case relied on the GPS device to locate the vehicle and observe its location at the Ilawood address but completed the remainder of the investigation through police observation.

Both the Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution protect an individual from "unreasonable searches and seizures[.]" Our supreme court has stated that "[w]e are free to interpret the provisions of our state constitution to afford greater protection than the federal constitution." *State v. Cox*, 171 S.W.3d 174, 183 (Tenn. 2005). A warrantless search is presumed unreasonable under both the federal and state constitutions, and evidence seized from the warrantless search is subject to suppression, unless the State demonstrates by a preponderance of the evidence that the search was "conducted pursuant to one of the narrowly defined exceptions to the warrant requirement." *State v. Simpson*, 968 S.W.2d 776, 780 (Tenn. 1998); *see Coolidge v. New Hampshire*, 403 U.S. 443, 454-55 (1971).

Here, Metro Police officers attached a GPS device to the defendant's vehicle without obtaining a search warrant. In *United States v. Jones*, a case decided after officers conducted the search in the case *sub judice* but before the defendant proceeded to trial, the United States Supreme Court held that the placement of a GPS tracking device on the defendant's vehicle constituted a search for the purposes of the Fourth Amendment. *Jones*, 132 S. Ct. at 946. The Court relied on a trespass theory to conclude that a search had occurred. *See id.* at 952-53. Thus, under *Jones*, the use of the GPS device in this case constituted a search and because officers conducted the search without a warrant, the evidence obtained from the search must be excluded unless the search falls within one of the exceptions to the warrant requirement.

The primary exceptions to the warrant requirement are: (1) consent to search; (2) search incident to arrest; (3) plain view; (4) stop and frisk; (5) hot pursuit; and (6) search under exigent circumstances, and others." *See State v. Meeks*, 262 S.W.3d 710, 722 (Tenn. 2008); *State v. Brock*, 327 S.W.3d 645, 681 (Tenn. Crim. App. 2009). However, none of these exceptions are applicable to justify the warrantless use of the GPS device. Neither the

19

defendant nor the owner of the car consented to permit police to attach the GPS device. *See State v. Bartram*, 925 S.W.2d 227, 230 (Tenn. 1996) (stating that "[i]t is, of course, well settled that one of the exceptions to the warrant requirement is a search conducted pursuant to consent.") (citations omitted). The search was not conducted incident to the defendant's arrest because the search occurred before police arrested the defendant, and "a search incident to arrest may not proceed the arrest and serve as part of the justification for the arrest." *State v. McMahan*, 650 S.W.2d 383, 387 (Tenn. Crim. App. 1983) (citing *Sibron v. New York*, 392 U.S. 40, 63 (1968)). The "plain view" exception cannot save the search because officers did not have the right to be in a position to view the results of the GPS search. *See State v. Hawkins*, 969 S.W.2d 936, 938 (Tenn. Crim. App. 1997) (stating that question of whether officers had a right to be in a position to view contraband seized after a warrantless search of a defendant's vehicle depended "on whether the initial approach of the vehicle was constitutionally permissible."). The "stop and frisk" exception is inapplicable because the search did not involve the detention of the defendant for investigatory purposes. *See Terry v. Ohio*, 392 U.S. 1, 21 (1968). The search was not conducted under a theory of "hot pursuit" because the GPS device was not attached during a period immediately following a crime, and a necessary delay to obtain a search warrant did not endanger the lives of the investigating officers. *See McMahan*, 650 S.W.2d at 387. Finally, the record contains no proof that exigent circumstances existed to "give rise to an objectively reasonable belief that there was a compelling need to act and insufficient time to obtain a warrant." *State v. Meeks*, 262 S.W.3d 710, 723 (Tenn. 2008).

The State asks this court to adopt the "good faith" exception to the exclusionary rule to find that the search was constitutional. In *United States v. Leon*, 468 U.S. 897 (1984), the Supreme Court established what is now recognized as the "good faith" exception to the warrant requirement. *Id.* at 913. In *Leon*, the Court held that evidence seized in good faith reliance upon a search warrant that was later found to be defective was admissible at trial. *Id.* at 913. This exception has evolved since the Court's decision in *Leon*, and it functions to permit the prosecution to introduce into its case-in-chief evidence obtained in the violation of the Fourth Amendment when the officers obtaining the evidence acted in good faith. *See Davis*, 131 S. Ct. at 2434 (holding that the "good faith" exception did not require suppression when officers conducted a search "in objectively reasonable reliance on binding appellate precedent."); *Herring v. United States*, 555 U.S. 135, 137, 144 (2008) (holding that isolated and nonrecurring error by police employee in maintaining records in an arrest warrant database did not warrant suppression of evidence); *Arizona v. Evans*, 514 U.S. 1, 14 (1995) (holding that good faith exception applied when police officers reasonably relied on erroneous information about an arrest warrant in a database maintained by judicial employees); *Illinois v. Krull*, 480 U.S. 340, 349-50 (1987) (holding that good faith exception extended to a search conducted in reasonable reliance on a statute that was later found unconstitutional). The Court reasoned that the purpose of the exclusionary rule is not to

20

"'redress the injury'" caused by an unconstitutional search but to deter future Fourth Amendment violations by law enforcement. *Davis*, 131 S. Ct. at 2426 (quoting *Stone v. Powell*, 428 U.S. 465, 486 (1976)). Therefore, exclusion is only appropriate when the deterrence benefits of suppression outweigh its heavy societal costs. *Id.* at 2427.

However, Tennessee has not adopted the good faith exception to the exclusionary rule. *State v. Carter*, 16 S.W.3d 762, 768 n.8 (Tenn. 2000) ("Moreover, this Court has yet to adopt the exception, and we decline to address its validity under the Tennessee Constitution until the issue is squarely presented."); *State v. Bearden*, 326 S.W.3d 184, 188 (Tenn. Crim. App. 2010); *State v. Clifford Deleon Thomas*, 2013 WL 4715660, at *3 ("Tennessee courts have repeatedly passed on other opportunities to recognize an officer's 'good faith' as an exception to the exclusionary rule in other contexts."). In *State v. Lonnie Taylor*, No. 86-144-lll, 1987 WL 25417 (Tenn. Crim. App. Dec. 4, 1987), this court opined that:

> The good faith exception created by *Leon* is nothing more than a federal rule of evidence. In *Leon* the United States Supreme Court said the federal exclusionary rule is not "a necessary corollary of the Fourth Amendment" or "required by the conjunction of the Fourth and Fifth Amendments." *Leon*, 468 U.S. at 906. *See Mapp v. Ohio*, 367 U.S. at 655-657. According to the Court, the Fourth Amendment " 'has never been interpreted to proscribe the introduction of illegally seized evidence in all proceedings or against all persons.' " *Leon*, 468 U.S. at 906, quoting from *Stone v. Powell*, 428 U.S. at 486. The Court described the rule as "a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the person aggrieved." *Leon*, 468 U.S. at 906, quoting from *United States v. Calandra*, 414 U.S. 338, 348 (1974).

*Id.* at *7 (some citations omitted). In declining to apply the good faith exception, this court reasoned that the public interest did not require and the Tennessee Constitution did not permit the modification of the exclusionary rule. *Id.* at *8. The court noted that Tennessee courts "have been reluctant to relax the exclusionary rule because it impugns the integrity of the judicial branch of government." *Id.* It is not the role of the courts to permit the State "'to utilize the wrong thus committed against the citizen to punish the citizen of his wrong.'" *Id.* (quoting *Hughes v. State*, 238 S.W.2d 588, 594 (Tenn. 1922)). By admitting such evidence, the court "'condone[s] this lawlessness and in the process dirty their hands with the unconstitutional spoils.'" *Id.* (quoting *State v. Novembrino*, 491 A.2d 37, 46 (N.J. App. Div.1985). Preventing the use of one wrong to prosecute another "is one of the most compelling reasons to exclude evidence seized in violation of the Fourth Amendment." *Id.*

In this case, the good faith exception created in *Davis* appears to be squarely before this Court because both parties premise their arguments as to the GPS device on the definition of "binding appellate precedent." Theoretically, there is nothing to prevent this court from considering whether binding precedent existed upon which officers could have reasonably relied to attach the GPS device without a warrant. However, this court functions as an error-correcting court. *See Aslip v. Johnson City Medical Center*, No. E2004-00831-COA-R9-CV, 2005 WL 1536192, at *7 (Tenn. Ct. App. June 30, 2005) (stating that Tennessee Court of Appeals is "an error-correcting intermediate appellate court"). We have previously stated that "neither the trial court nor this court has the authority to create a good faith exception to the Tennessee exclusionary rule since an inferior court may not modify, revise, modernize, or overrule a rule created by the Supreme Court." *State v. Lonnie Taylor*, 1987 WL 25417, at *7. Our supreme court has yet to recognize good faith as an exception to the exclusionary rule, and thus we believe that it is not our role to do so in this case.

Because Tennessee has yet to recognize a good faith exception to the exclusionary rule, we must conclude that the trial court's analysis, while well-reasoned, was incorrect. *Jones* explicitly held that the placement of a GPS tracking device constituted a search for the purposes of the Fourth Amendment. Therefore, we conclude that the use of the GPS device in this case was a search. Because the good faith exception does not apply, and the State does not contend that any other exceptions exist to validate the warrantless use of the GPS device, we must conclude that the search was unlawful.[2] However, this conclusion does not end our inquiry because we must address the trial court's finding that GPS information was not the only source of information regarding the location of the defendant's vehicle. *See Odom*, 928 S.W.2d at 23 ("[A] trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise.").

Having concluded that the search was unlawful, we must determine the effect of this illegality on the admissibility of the defendant's subsequent statement to police. In determining whether a confession obtained from an illegal search or seizure is admissible, this court applies the "fruit of the poisonous tree" analysis. *Brown*, 422 U.S. at 591-92; *State v. Huddleston*, 924 S.W.2d 666, 674 (Tenn. 1996); *State v. Ford*, 30 S.W.3d 378, 380 (Tenn. Crim. App. 2000). This analysis focuses on whether the evidence was obtained through an exploitation of the Fourth Amendment illegality. *Huddleston*, 924 S.W.2d at 674 (citing *Wong Sun v. United States*, 371 U.S. 471, 488 (1963)). The *Brown* court suggested four factors to assist courts in making this determination: "(1) the presence or absence of *Miranda* warnings; (2) the temporal proximity of the arrest and the confession; (3) the presence of

---

[2]There is no need to address either party's arguments of whether "binding appellate precedent" existed to justify the officers' actions because we concluded that good faith reliance on such precedent was not an exception to the exclusionary rule.

22

intervening circumstances; and finally, of particular significance, (4) the purpose and flagrancy of the official misconduct." *Id.* (citing *Brown*, 422 U.S. at 603-604).

Here, the defendant was given *Miranda* warnings, read a waiver of rights form, and signed the form, although officers did state that they could not discuss the reason for the defendant's arrest until he signed the rights form. Although not determinative, this indicates that the defendant was aware of his right against self-incrimination and weighs slightly against suppression. *See State v. Carter*, 16 S.W.3d 762, 767 (Tenn. 2000). The temporal proximity of the arrest to the confession weighs in favor of suppression because the time period between the defendant's arrest and incriminating statements was less than three hours. *See Taylor v. Alabama*, 457 U.S. 687, 691 (stating that a six-hour period between a defendant's arrest and confession was insignificant when the defendant was in police custody, unrepresented by counsel, questioned on several occasions, fingerprinted, and subjected to a lineup); *State v. Ford*, 30 S.W.3d 378, 381 (Tenn. Crim. App. 2000) (stating that period of four to five hours between illegal search and written confession weighed in favor of suppression of the written statement). The third factor also weighs in favor of suppression because there is no evidence that the defendant spoke with anyone before giving his statements. *See Huddleston*, 924 S.W.2d at 675 (stating that one example of an intervening circumstance "is the arrestee's consultation with an attorney, relative, friend, or priest prior to the time a statement is given."). The fourth factor weighs slightly in favor of attenuation. There is nothing in the record to suggest that officers in this case were attempting to purposefully violate the defendant's Fourth Amendment rights, rather than mistakenly believing that they had probable cause to arrest the defendant. *See State v. Linda Greene*, No. E2008-00884-CCA-R3-CD, 2009 WL 3011108, at *9 (Tenn. Crim. App. Sep. 22, 2009) (stating that although the purpose and flagrancy of official misconduct weighed against suppression when there was "no evidence that the officers in this case were attempting to circumvent the Defendant's Fourth Amendment rights in conducting official police activity, rather than mistaking whether their actions were constitutionally permissible[,]" suppression was warranted when other factors weighed in favor of suppression). Considering all of the factors, we conclude that the defendant's confession was not sufficiently attenuated from the illegal search.

### III. Warrantless Arrest

The defendant argues that officers did not have probable cause to arrest him because the only physical link between the defendant and the burglaries was the gold Cadillac that belonged to Ms. Stewart and because he did not commit the crime of criminal impersonation. He contends that the trial court misinterpreted the facts; no proof showed that the Cadillac belonged to him, and the jewelry was not discovered until the defendant was taken into custody.

23

"[T]he general rule is that a warrantless search or seizure is presumed unreasonable and any evidence discovered is subject to suppression." *State v. Echols*, 382 S.W.3d 266, 277 (Tenn. 2012). However, an arrest supported by probable cause is an exception to the warrant requirement. *Echols*, 382 S.W.3d at 277 (citing *State v. Hanning*, 296 S.W.3d 44, 48 (Tenn. 2009); *see also Brown v. Illinois*, 422 U.S. 590, 598 (1975)). Probable cause exists when the facts and circumstances as they are known to the officers at the time of the arrest are "'sufficient to warrant a prudent [person] in believing that the [defendant] had committed or was committing an offense.'" *Echols*, 382 S.W.3d at 277-78 (citations omitted). However, "the fruits of an unlawful search cannot provide probable cause for an arrest.) *United States v. McCarthy*, 648 F.3d 820, 839 (9th Cir. 2011) (citing *Johnson v. United States*, 333 U.S. 10, 16-17 (1948)). After the motion to suppress hearing, the trial court found that police observation independent of the use of the GPS device was utilized to lead to the defendant's arrest. The court also found that police had probable cause to arrest the defendant for burglary based upon the location of the defendant's vehicle at the Ilawood address, the discovery of a recent burglary, the subsequent discovery of the vehicle at the defendant's address, and police observation of the defendant walking away from his residence. The trial court also noted that police had probable cause to arrest the defendant for criminal impersonation because he presented police with a false identification.

After reviewing the record, we are not persuaded that independent police observation separate from the use of the GPS device led to the defendant's arrest. Without the use of the GPS tracking device, officers would have been unaware of the vehicle's location at the Ilawood address and unaware of the burglary that occurred. The GPS device placed officers in a position to visually observe the defendant's vehicle at his mother's residence moments after the burglary and to locate the defendant walking up the street. Without using the device, officers likely would not have located and stopped the defendant. The GPS device played an integral role in the discovery of the Ilawood burglary and subsequent arrest of the defendant. Based upon the evidence, we conclude that the probable cause to arrest the defendant was not generated from a means independent of the constitutional violation. Because the defendant was subject to a warrantless arrest that lacked probable cause, we conclude that the seizure of the defendant was illegal.

### IV. Waiver of Miranda Rights

The defendant argues that the trial court erred in finding that his waiver of his *Miranda* rights was knowing and voluntary. Specifically, he contends that the totality of the circumstances indicate that the defendant's waiver was "a product of intimidation, coercion, and deception."

Both the United States and the Tennessee Constitutions protect a defendant against

24

compelled self-incrimination. *State v. Walton*, 41 S.W.3d 75, 81 (2001). The Self-Incrimination Clause of the Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." Article I, section 9 of the Tennessee Constitution provides that "in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself."

In order to protect the right against self-incrimination, the prosecution may not use the statement of a defendant resulting from a custodial interrogation unless officers first advise the defendant of the right to remain silent and the right to counsel. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). A defendant may waive these rights so long as the waiver is made "voluntarily, knowingly, and intelligently." *Id.* A confession is not voluntary when it is the product of coercive state action. *State v. Downey*, 259 S.W.3d 723, 733 (Tenn. 2008). The test of voluntariness is broader under the state than under the federal constitution, and a confession "must not be the product of 'any sort of threats or violence, . . . any direct or implied promises, however slight, nor by the exertion of any improper influence.'" *Id.* at 733-34 (quoting *Smith v. State*, 42 S.W.3d 101, 109 (Tenn. Crim. App. 2000)). However, "[p]romises of leniency by state officers do not render subsequent confessions involuntary *per se*." *State v. Smith*, 933 S.W.2d 450, 455 (Tenn. 1996). The critical question is whether the conduct of law enforcement officers was of a nature to overbear the defendant's will to resist. *Id.* at 455-56. This court must determine "whether the accused was so gripped by the hope of leniency that he did not or could not freely and rationally choose among the available courses of action.'" *State v. Kelly*, 603 S.W.2d 726, 729 (Tenn. 1980) (quoting *Hunter v. Swenson*, 372 F.Supp. 287, 300 (W.D. Mo. 1974)). Courts must examine the totality of the circumstances to determine whether a waiver of *Miranda* rights was voluntary, knowing, and intelligent. *State v. Climer*, 400 S.W.3d 537, 568 (Tenn. 2013). Factors to consider in determining voluntariness include: the age and background of the defendant, the level of education and intelligence, reading and writing skills, demeanor and responsiveness to questions, prior experience with police, any mental disease or disorder, any intoxication at the time of waiver, and the manner, detail, and language in which the *Miranda* rights were explained. *Id.*

The trial court likened the failure to inform the defendant as to the true reason for his arrest to a case where a suspect asks police officers about the evidence against him, and officers tell him that they cannot discuss the evidence until the suspect executes a waiver of his rights. *See State v. Miller*, 674 S.W.2d 279, 283 (stating that when the accused asked officers what evidence they had against him, the officers "properly advised" him that they could not discuss the matter until the accused signed a waiver of his rights). The court found "that the police interview was not a model interrogation" and questioned why officers withheld the true reason for the defendant's arrest, but the court found that the defendant voluntarily waived his *Miranda* rights. The court noted that the defendant was an educated

individual who had several prior police interviews over the preceding years. The court further noted that he did not invoke his rights when he was placed on notice with questions about the recent burglary. The defendant testified that when he was initially detained, officers advised him that a burglary had been committed "right down the street" and that during the ride to the precinct, they accused him of committing more than twenty burglaries at an apartment complex.

We agree with the trial court that the failure to disclose the true reason for the defendant's arrest is puzzling, but we conclude that such failure with this case did not fatally invalidate the defendant's waiver of his rights. The defendant was well-educated; he had two associate degrees, and he had prior experience with police due to his four previous felony convictions for burglary. The defendant also asserted multiple times that he understood everything the officer told him about waiving his *Miranda* rights. Although the defendant was not specifically informed that officers wished to question him about a recent burglary, the defendant did not invoke his rights after learning why he was arrested but instead asked for a break to smoke a cigarette and continued talking to the officers.

The officer's statements regarding the consequences of the defendant's execution of a waiver of his rights presents a much closer question. After officers refused to disclose the reason for the arrest, the defendant stated, "If I am under arrest, I am under arrest. Let's go[.]" The defendant stood, and as one detective replied "Okay," gathered his papers, and moved to get up, the second detective remained seated and asked the defendant, "Where are you going to go?" Contrary to the defendant's testimony, the detective did not "bang his fists on the table" and scare the defendant into sitting back down. The detective asked the defendant if he wanted "to try to clear this up or not[][,]" and the defendant asked if officers were "going to let [him] go[.]" The detective replied, "It's a good possibility[,]" prompting the defendant to ask, "A possibility or yes or no?" The detective then told the defendant, "I guarantee it won't hurt you." The detective later clarified his comment regarding the defendant's release, stating, "If you convince us – I said if you convince us you were not involved in anything then, yeah, you're gone." This exchange occurred prior to the defendant's execution of his waiver.

Standing alone, the statement "I guarantee it won't hurt you" appears to be the exact promise of leniency that the Fifth Amendment prohibits. However, this court must consider the totality of the circumstances to determine whether the defendant's will was "completely overborne" and thus incapable of executing a voluntary waiver of his rights. When the phrase is examined in the context of the entire interview, it appears that the officer used the word "guarantee" not to indicate that the defendant's statement would not be used against him but to convey to the defendant that being truthful would help demonstrate his cooperation to the district attorney. This statement also occurred prior to, rather than

subsequent to, the defendant's signing of the waiver.  The defendant was a thirty-two year old man with two associate degrees and prior police experience, as he had four previous convictions for burglary.  The interrogation lasted about two and a half hours but was paused for the defendant to take a lengthy break to smoke a cigarette.  The defendant was only briefly detained before the interrogation and was advised of his constitutional rights by the detective.  The defendant stated twice that he "underst[ood] everything" the detective said regarding his *Miranda* rights.  He told police that he did not feel intoxicated, and officers did not believe him to be intoxicated.  There is nothing in the record to indicate that police physically abused the defendant or threatened him with abuse.  We conclude that the defendant's waiver was knowing and voluntary, and the defendant is not entitled to any relief as to this issue.

## V. Unavailable Witness

The defendant argues that the trial court erred in declaring Jongho Lim unavailable and admitting his prior testimony as substantive evidence.  Specifically, the defendant contends that his right to confront witnesses against him was violated because Mr. Lim stated that he was willing to return to the United States and testify if the State paid the costs of airfare.  The State argues that this issue is waived for failure to include the trial court's factual findings in the appellate record.  Alternatively, the State argues that the trial court did not abuse its discretion because the State made a good-faith effort to locate Mr. Lim, and the defendant received the opportunity to cross-examine Mr. Lim during the preliminary hearing.

A party seeking appellate review has "a duty to prepare a record which conveys a fair, accurate and complete account of what transpired with respect to the issues forming the basis of the appeal."  *State v. Ballard*, 855 S.W.2d 557, 560 (Tenn. 1993).  The failure to include a transcript of the proceedings germane to the issue challenged on appeal precludes this court from considering the issue.  *Id.* at 560-61.  Here, the trial court stated at the motion for new trial, "And about the victim unavailability, I believe we went over that pretrial.  So I'll rely upon my -- I'm relying on that."  The defendant has failed to include a transcript from this hearing as part of the record on appeal.  Accordingly, we conclude that the defendant has failed to properly preserve this issue for appeal.  *See* Tenn. R. App. P. 24(b).

## VI. Consecutive Sentencing

The defendant argues that the trial court erred by imposing consecutive sentences.  Specifically, he contends that it was error to order consecutive sentences based upon the defendant's use of a knife because its use was due to a mistake made by the defendant in believing the residence was unoccupied.

This court reviews the imposition of consecutive sentences under an abuse of discretion standard accompanied by a presumption of reasonableness. *State v. James Allen Pollard*, — S.W.3d —, No. M2011-00332-SC-R11-CD, 2013 WL 6732667, at *9 (Tenn. Dec. 20, 2013). The trial court's exercise of its discretionary authority to impose consecutive sentences is afforded deference if "it has provided reasons on the record establishing at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b)." *Id.* When the trial court orders consecutive sentencing based upon its classification of the defendant as a dangerous offender, it "must make specific findings regarding the severity of the offenses and the necessity to protect society[.]" *State v. Lane*, 3 S.W.3d 456, 460-61 (Tenn. 1999) (citing *State v. Wilkerson*, 905 S.W.2d 933, 939 (Tenn. 1995)). "So long as a trial court properly articulates reasons for ordering consecutive sentences, thereby providing a basis for meaningful appellate review, the sentences will be presumed reasonable and, absent an abuse of discretion, upheld on appeal." *Pollard*, — S.W.3d —, 2013 WL 6732667, at *9.

The trial court found that consecutive sentences reasonably related to the severity of the offenses because the defendant committed an aggravated burglary where the victim was at home, and the defendant pulled a knife on the victim and threatened to kill him. The court also found that in addition to his prior criminal record, the defendant was responsible for "about forty-three other burglaries," with property only recovered from some of the burglaries. Consecutive sentences were necessary to protect the public from further serious criminal activity committed by the defendant because the defendant was on probation for reckless aggravated assault at the time he committed the burglary that led to his conviction. The court found that the defendant had previously violated his probation, and rather than utilize the "opportunities to correct his criminal activity. . . . he continue[d] in that stead."

The record reflects that the trial court made the requisite findings to support consecutive sentences. We conclude that the trial court did not abuse its discretion in ordering consecutive sentences. According, the defendant is not entitled to relief as to this issue.

## VII. Cumulative Error

The defendant argues that he is entitled to relief based upon the cumulative errors of the trial court. Having concluded that the defendant is entitled to relief based upon the denial of his motion to suppress, we need not address the issue of cumulative error.

## CONCLUSION

Based upon the foregoing, we affirm the trial court's denial of the defendant' motion

to suppress with regard to the traffic stop, its finding that the defendant knowingly and voluntarily waived his *Miranda* rights, the declaration of Jongho Lim as an unavailable witness, and the imposition of consecutive sentences. We reverse the trial court's denial of the motion to suppress with respect to the evidence acquired as a result of the warrantless search of the defendant's vehicle with the GPS tracking device and remand for a new trial.

_____

JOHN EVERETT WILLIAMS, JUDGE